ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| SUFI Network Services, Inc. | )  ASBCA No. 55306 |
| | ) |
| Under Contract No. F41999-96-D-0057 | ) |

APPEARANCES FOR THE APPELLANT:        Frederick W. Claybrook, Jr., Esq.
                                                              Brian T. McLaughlin, Esq.
                                                                Crowell & Moring LLP
                                                                Washington, DC

APPEARANCES FOR THE GOVERNMENT:   Lt Col James H. Kennedy III, USAF
                                                                 Air Force Chief Trial Attorney
                                                              Christopher S. Cole, Esq.
                                                              Joel B. Lofgren, Esq.
                                                              Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE JAMES
ON REMAND FROM THE U.S. COURT OF FEDERAL CLAIMS
AND THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT

SUFI Network Services, Inc. (SUFI), submitted a $131,169,649.62 claim, comprised of 28 counts, to the Air Force Non-Appropriated Funds Purchasing Office (AFNAFPO) contracting officer (CO) under the captioned contract. In January 2006 SUFI appealed to the Board from the CO's deemed denial of its claim. The Board's 21 November 2008 decision sustained the appeal in the amount of $3,790,495.65. *SUFI Network Services, Inc.*, ASBCA No. 55306, 09-1 BCA ¶ 34,018 at 168,291 (*SUFI VIII*). In deciding SUFI's multiple motions for reconsideration, we ultimately increased SUFI's award to $7,416,751.52. *SUFI Network Services, Inc.*, 10-1 BCA ¶ 34,415 at 169,887 (*SUFI XI*).

In 2011 SUFI filed for Wunderlich Act review by the U.S. Court of Federal Claims (COFC) with respect to 12 of the 28 counts decided by the Board (counts I, III, V, VI, VII, VIII, IX, XI, XV, XVI, XVIII, and XXII). The COFC on 8 November 2012 awarded SUFI $114,138,259.99, net of the $4,625,821.35 awarded by this Board, on 10 of those 12 counts (counts I, III, V, VI, VII, VIII, XI, XVI, XVIII, and XXII). *SUFI Network Services, Inc. v. United States*, 108 Fed. Cl. 287, 321 (2012) (*SUFI XIV*). The COFC left undisturbed the 18 SUFI counts (II, IV, IX, X, XII, XIII, XIV,

XV, XVII, XIX, XX, XXI, XXIII, XXIV, XXV, XXVI, XXVII and XXVIII) on which the Board awarded $2,790,930.17. 108 Fed. Cl. at 321.[1]

The parties cross-appealed from that COFC decision to the United States Court of Appeals for the Federal Circuit (CAFC), on the referenced 10 counts. The CAFC's 29 May 2014 decision in *SUFI XVI*, 755 F.3d at 1326, affirmed in part, reversed in part, vacated in part, and remanded "to the Court of Federal Claims, with instructions to remand to the Board for further factual findings consistent with this opinion" as described below. Familiarity with the prior SUFI decisions is assumed.

In *SUFI XVI* the CAFC: (1) affirmed the COFC's decision (affirming the Board's decision) on count IX, Kapaun Line Fee, and affirmed the COFC decision in part on count XVI, Lost Profits, 755 F.3d at 1322-23, 1325-26; (2) reversed the COFC's decisions on count I, Calling Cards, on the issue of lost revenues, and count VIII, Prime Knight Lodgings, 755 F.3d at 1313-14, 1320-21, holding that the Board's damage calculations for both counts were supported by substantial evidence; (3) vacated and/or reversed the COFC's decisions and remanded to the Board for further fact-finding on the following counts by number, designation and CAFC citation:

| Count | Designation | 755 F.3d at |
|-------|-------------|-------------|
| III | Hallway/Lobby DSN Phones | 1316-17 |
| V | Other Operator Numbers and Patching | 1318 |
| VI | Early DSN Abuse | 1319 |
| VII | Delta Squadron | 1320 |
| XI | German Troops Housing | 1321 |
| XVI | Post-Termination Lost Profits (in part) | 1322 |

and (4) reversed the COFC's ruling that SUFI was entitled to overhead expenses in its breach damages and equitable adjustments for extra work (finding no reason to disturb the Board's finding of lack of proof of such overhead expenses), but ordered a remand to the Board to include 10% profit "for all work and out-of-pocket expenses, whether incurred as a result of a contract change or breach." 755 F.3d at 1324.

After receipt of the COFC's remand order, on 18 August 2014 the Board ordered the parties to recommend remand procedures and sought their views on an ADR mediation. SUFI proposed that no new evidence be adduced, stated that the parties' recent discussions of an ADR mediation "did not bear fruit" and asked the

---

[1] The Federal Circuit stated: "That amount [$2,790,930.17] became final." *SUFI Network Services, Inc. v. United States*, 755 F.3d 1305, 1311 (Fed. Cir. 2014).

Board on remand to adopt the procedure the COFC used of issuing a draft decision leaving blanks for the parties to fill-in the amounts due. The Air Force proposed that the Board take judicial notice of certain facts or to admit expert testimony on such facts. The Board's 16 September 2014 order stated that the evidentiary record remains closed and set a remand action schedule, which did not include the COFC draft decision procedure. On 2 October 2014 the Board denied the Air Force's motion to take judicial notice of 11 proposed facts regarding telephone usage trends and base closures.

We identify the CAFC's specific remand instructions and state, as appropriate, our supplemental findings[2] or conclusions, or both, with respect to the remanded counts.

## Count I, Calling Cards

The CAFC's decision on count I did not expressly remand the issue of adding 10% profit to the Board's damages award for extra work and claim preparation costs, nor did it require any further fact-finding thereon. 755 F.3d at 1313-14. However, it did remand for Board addition of profit "for all work and out-of-pocket expenses" and saw "no error in the Board's selection of a 10% profit rate." *Id.* at 1324. Hence we interpret that remand order to embrace counts I, III, V, VI, VII, VIII and XI.

SUFI calculates $1,650.97 as 10% profit on the $16,509.67 in extra work, claim preparation costs and out-of-pocket expenses awarded on count I (app. remand br. at 30). *SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,275; *SUFI IX*, 09-2 BCA ¶ 34,201 at 169,094. SUFI also avers that the Board miscalculated the $14,034.60 costs for extra work and claim preparation, which should be corrected to $14,448.58, for a $413.98 difference ($14,448.58 - $14,034.60), plus $41.40 for 10% profit (app. remand br. at 31). Respondent contests the 10% profit on the claim preparation fee, because it is uncertain whether profit was already included in the Board's claim preparation calculations, but does not dispute SUFI's "minor amount" of $413.98 (gov't remand reply br. at 13-14).

We reviewed the evidence supporting our finding 11 in *SUFI VIII* for SUFI employees Ansola, Congalton, Smith and Broyles who performed extra work and claim preparation for count I. We derived their hourly rates by dividing by 2,080 hours their annual salaries, including bonuses and educational allowances, but not "profit." 09-1 BCA ¶ 34,018 at 168,219; *SUFI IX*, 09-2 BCA ¶ 34,201 at 169,094 (correcting Ansola's annual salary to $77,500). Out-of-pocket costs excluded profit

---

[2] Supplemental findings in this decision are numbered starting with S1 to avoid confusion with findings in the Board's 11 prior SUFI decisions.

3

($618.77) and interest ($106.08). We hold that $1,650.97 in profit is not a double recovery.

SUFI's June 2005 claim listed 368.65 hours for count I claim preparation (app. remand br. at 30-31, attach. F at 1-3). However, a 7.25 hour entry was misstated as 7.15 hours, and a 1.5 hour entry was omitted (*id.*, attach F at 1-3 n.4).[3] Thus, the total claim preparation hours were 370.25 (368.65+1.6). SUFI was awarded $10,179.47 for 368.65 hours of claim preparation. *SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,276, 169,290; *SUFI IX*, 09-2 BCA ¶ 34,201 at 169,094. The claim preparation amount for 370.25 hours is $10,593.46, which is $413.99 more than $10,179.47. Profit at 10% on $413.99 is $41.40, totaling $455.39. We hold that SUFI is entitled to recover an added $2,106.36 ($1,650.97 + $455.39) on count I.

### Count III, Hallway/Lobby DSN Phones

The Board denied recovery of lost revenues for the Air Force's breach of contract by delaying and refusing to remove all hallway and lobby DSN phones from lodging facilities because "[t]he call data SUFI used for phone x.4619 to calculate lost revenue damages did not distinguish between official and non-official calls." *SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,242. On reconsideration, we found that 1,738,387 minutes were a "fair and reasonable approximation of the non-official calls," and ultimately awarded $1,296,723.50 in lost revenues. *SUFI IX*, 09-2 BCA ¶ 34,201 at 169,089; *SUFI XI*, 10-1 BCA ¶ 34,415 at 169,887. The CAFC ruled that the COFC erred in determining $53,700,352.41 for count III damages, vacated that ruling and remanded count III to the Board for "reconsideration" of specified issues regarding lost revenues due to DSN calls. 755 F.3d at 1316-17.

The CAFC ordered the Board to address or reconsider the following: whether an adverse inference should be drawn from the missing government DSN phone call records; whether any evidence supports the Board's methodology to derive the percentages of non-official DSN phone calls; our failure to provide adequate support for rejecting SUFI's contention that the reasonable number of additional minutes it would have had on its network, but for the Air Force breaches, was the number of non-local minutes on the DSN phones; what was the magnitude of "real-world record facts" that might affect the "purchase-limiting effect" of SUFI's long distance rates for guest room telephones; the legal and evidentiary bases of our apparent premise that SUFI could not charge for in-room access to the DSN for "official" long distance calls; SUFI's "evidence to correct the Ramstein Building No. 303 DSN phone start date from October 2000 to October 1999" and to "correct…the 10,135 average monthly rate to 10,609' [long distance] minutes per month" per phone and "reconsider its

---

[3] We verified that SUFI omitted 1.6 hours of claim preparation (tr. 13/19-21, 6/74-75).

rejection of the weighted-midpoint starting date for interest on damages." 755 F.3d at 1315-17.

## SUPPLEMENTAL FINDINGS OF FACT

S1. Our July 2009 decision stated that SUFI "excluded local calls from the lost revenues it calculated for surrogate phone # 4619." *SUFI IX,* 09-2 BCA ¶ 34,201 at 169,089; (misciting ex. B205, tab 4A at 212). That statement derived from SUFI's "NOTE: LOCAL DSN NUMBER CALLS ARE NOT INCLUDED IN THE ABOVE DATA," which note is not in exhibit B205, tab 4A at 212, but is in SUFI's 30 June 2005 claim (R4, tab 80A at 1725). In July 2009 we did not verify whether the phone x.4619 data queries support the foregoing NOTE. On remand we reviewed the x.4619 data queries (R4, tab 80A at 1726) to determine whether those queries verify SUFI's exclusion of local calls from the x.4619 call data.

S2. Modification No. 0005 added to contract § C, ¶ 3.1.1.3, "DSN SERVICE. The contractor shall provide DSN connectivity for in-room use. The level of DSN service shall be limited to base level. Base level includes DSN telephone prefixes within the base's immediate area." (R4, tab 8 at 1) *SUFI II,* 04-2 BCA ¶ 32,714 at 161,863. The bases SUFI serviced had the following local DSN telephone prefixes: Rhein Main, 330; Spangdahlem, 452/542; Bitburg, 453; Ramstein, 479/480; Landstuhl, 486/488; Vogelweh/Kapaun, 489; and Sembach, 496 (ex. B109 at 8, 10, ex. B110 at 1-8, 11, 14, 24-26, 36-37, 46-47, 54, 59-61, 65, ex. B205, tab 4A at 211). *SUFI VIII,* 09-1 BCA ¶ 34,018, finding 109(b).

S3. SUFI's data queries for the x.4619 call data used in both its 30 June 2005 claim (R4, tab 80A at 1726) and in its 13 February 2007 updated claim (ex. B205, tab 4A at 212), excluded calls to local DSN telephone prefixes 479, 480, 486, 488, 489 and 496. SUFI labeled these data queries "Query statement (long distance calls)" (ex. B223; tr. 23/63). SUFI's foregoing data queries omitted local DSN prefixes for Rhein Main (330) and Spangdahlem (452, 542)[4] (R4, tab 80A at 1726, ex. B205, tab 4A at 212). Hence, SUFI's 2005 statement, "LOCAL DSN NUMBER CALLS ARE NOT INCLUDED IN THE ABOVE DATA," is accurate to the extent that it is supported by its 2005/2007 data queries. Therefore, the record confirms that SUFI excluded local calls for surrogate phone x.4619 call data originating from each air base SUFI cited in count III except Rhein Main and Spangdahlem.

S4. Among thousands of guests SUFI serviced in 9 years, the record includes 30 guest complaints that the long distance rates were unreasonable (ASBCA No. 54503,

---

[4]  SUFI's count III did not claim damages from lodging guests at Bitburg (local prefix 453) (ex. B205, tab 4A at 206-97, 211).

5

R4, tab 220). Those complaints do not show whether those guests continued to use guestroom phones or used hallway/lobby DSN phones.

S5. Unlike the call data query for phone x.4619 described in finding S3, SUFI's 2005 and 2007 call data queries for phones x.6998 and x.6999 did not exclude local calls from the bases SUFI serviced namely, Rhein Main, Spangdahlem, Bitburg, Ramstein, Landstuhl, Vogelweh, Kapaun and Sembach. (R4, tab 84A at 2656; ex. B205, tab 8A at 360, ex. B224 at 1-2)

S6. SUFI began its tabulation of total long distance revenues derived from Ramstein in January 1997, Rhein Main in March 1997, Vogelweh/Kapaun in April 1997, Landstuhl in June 1997, Spangdahlem in December 1998 and Sembach in May 1999 (ex. B205, tab 16A at 430-38; gov't remand br. appendices A-F).

S7. SUFI first activated its telephone network at Ramstein guest lodgings on 14 December 1996 ("cut over") (ex. B205, tab 4A at 122), and hence it was susceptible of misuse of DSN phones for long distance calls.

S8. SUFI first corrects a $131,006.03 omission of Ramstein 303 lost revenues in its calculated $23,459,215.92 for unknown DSN phone numbers (ex. B205, tab 4A at 207, 211) (app. remand br. at 84 n.18). SUFI based its count III lost revenues on x.4619 call data (*id.* at 122 n.3). SUFI's 13 February 2007 updated count III net lost revenues were $53,692,407.91, including $23,459,215.92 for 95 unknown DSN phone numbers listed in 89 lines and $30,233,191.99 for known DSN numbers (*id.* at 211). Among those $53,692,407.91 are $176,778.72 for Spangdahlem building 38, number 542-5130 (*id.* at 170) and $2,135,213.46 for unknown numbers in Rhein Main buildings 600, 632, 633 and 634, totaling $2,311,992.18 (*id.* at 206-07).

S9. In SUFI's $23,459,215.92 total lost revenues calculated for unknown numbers, SUFI failed to include the first 2 of the 89 lines of entries for Ramstein 303, whose amounts were $25,184.46 and 105,821.56 (ex. B205, tab 4A at 206-07).

S10. Our review of SUFI's remand brief, attachment F, shows that we omitted .25 hours of Mr. Broyles' 27 September 2003, 3.75 hour entry (ex. B205, tab 4B).

S11. SUFI's 15 January 2010 motion for reconsideration in *SUFI XI*, stated: "The weighted midpoint is obtained by spreading the 'phone-months' for both the known and unknown phone numbers over the periods of usage, keeping a running total by month, dividing the grand total by 2, and seeing where the half-way usage point falls, which is February 21, 2000" (app. mot. at 11 n.5).

6

## DECISION ON COUNT III

We address first whether SUFI's lost revenues must exclude "official" calls and whether a reasonable measure of such lost revenues can be derived from the number of non-local minutes of DSN phone use. SUFI's contract proposal stated that it expected to receive the "exclusive right to transport [sic] long distance traffic and a percentage of any revenue derived from that traffic." The contract stated that SUFI's guaranteed "pricing for long distance traffic" was $0.99 per minute. *SUFI Network Services, Inc.,* ASBCA No. 54503, 04-2 BCA ¶ 32,714 at 161,857 (*SUFI II*), contract § B, ¶ 5.4.2.[5] The contract did not expressly or by implication require SUFI to exclude "official" long distance calls from its revenue base. Modification No. 0005 limited SUFI's duties to provide only local DSN calls at no cost. Thus, we hold that the contract included official calls among the long distance calls to whose revenues SUFI was entitled. *SUFI II*, 04-2 BCA ¶ 32,714 at 161,857, 161,859-61, 161,863.

On remand we reviewed the x.4619 phone data queries to determine whether they verify that SUFI excluded local calls from the x.4619 call data. (Finding S1)

Modification No. 0005 added to contract § C, ¶ 3.1.1.3, "DSN SERVICE," which limited the level of DSN service to base level, including "the base's immediate area." The bases SUFI serviced had the following local DSN prefixes: Rhein Main, 330; Spangdahlem, 452/542; Bitburg, 453; Ramstein, 479/480; Landstuhl, 486/488; Vogelweh/Kapaun, 489; and Sembach, 496. (Findings S1, S2)

SUFI's data queries for the x.4619 call data used in both its 30 June 2005 claim and in its 13 February 2007 updated claim, excluded calls to the local DSN prefixes for Ramstein, Lundstuhl, Vogelweh/Kapaun and Sembach but omitted local DSN prefixes for Rhein Main (330) and Spangdahlem (452, 542). SUFI labeled these data queries "Query statement (long distance calls)." SUFI's count III statement that it excluded local calls for surrogate phone x.4619 call data originating from each air base it serviced is accurate except for Rhein Main and Spangdahlem. (Finding S3)

The Board's *SUFI VIII* decision rejected SUFI's use of telephone 4619 call data for the principal reason that such data do not provide "a basis by which we can reasonably determine the extent of official and non-official calls in the baseline phone x.4619 call data SUFI used." 09-1 BCA ¶ 34,018 at 168,242. In light of the CAFC decision, the distinction of "official" from "non official" calls is not material under the terms of this contract.

---

[5] SUFI argued in its December 2008 motion for reconsideration that "the relevant contractual distinction is between local and long distance traffic...not between official and non-official" (*SUFI IX*, app. mot. at 30).

With respect to the risk of uncertainty of proof of damages, we give SUFI the benefit of an adverse inference drawn from the missing government DSN call records. *SUFI XVI*, 755 F.3d at 1315 (citing *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946)). Accordingly, we hold that one can reasonably determine from the x.4619 long distance call data SUFI's lost revenues attributable to hallway/lobby DSN calls (except for Rhein Main and Spangdahlem calls).

We turn to whether, as respondent argues, SUFI's count III lost revenues should be discounted because of the opportunity of guests to be reimbursed for official long distance calls and the magnitude of "real-world record facts" regarding the effects of SUFI's long distance rates. From among thousands of guests SUFI serviced in 9 years, the record includes 30 hotel guest complaints that the long distance rates were unreasonable. Those complaints do not show whether the complaining guests continued to use guestroom phones or used hallway/lobby DSN phones. (Finding S4) We hold that these record facts do not support any discount of SUFI's count III lost revenues.

SUFI suggests the use of Delta Squad DSN phones x.6998 and x.6999 as alternative surrogate DSN phone numbers (app. remand br. at 39, 42). Unlike the call data query for phone x.4619 described above, SUFI's 2005 and 2007 call data queries for phones x.6998 and x.6999 did not exclude local calls from the bases SUFI serviced, namely, Rhein Main, Spangdahlem, Bitburg, Ramstein, Landstuhl, Vogelweh, Kapaun and Sembach. (Finding S5) Hence, Delta Squad DSN phones x.6998 and x.6999 are not equivalent to x.4619 for purposes of measuring count III lost revenues.

The government argues that we should measure SUFI's count III lost revenues "by comparing SUFI's actual revenue immediately before and after the addition or removal of hallway/lobby [DSN] phones" (gov't remand br. at 6-8, 13, 15). SUFI began its tabulation of total long distance revenues derived from Ramstein in January 1997, Rhein Main in March 1997, Vogelweh/Kapaun in April 1997, Landstuhl in June 1997, Spangdahlem in December 1998 and Sembach in May 1999 (finding S6).

We disregard the government's new theory of revenue comparison before and after adding and removing hallway/lobby DSN phones for several reasons. SUFI saw hallway/lobby DSN phones in Ramstein and Rhein Main guest lodgings in February 1996 before contract award. *SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,235. SUFI first activated its telephone network at Ramstein guest lodgings on 14 December 1996 ("cut-over"), and hence it was susceptible to the abuse of long distance calling on DSN phones at that time (finding S7). Starting in mid-December 1996 SUFI repeatedly asked the Air Force to remove those DSN phones. 09-1 BCA ¶ 34,018 at 168,236. Therefore, it is apparent that there is no valid "before" breach period to compare to the breach period for determining lost revenues. Moreover, the government's new theory

was not raised at the Board in *SUFI VIII, IX, X, and XI*, and hence was waived, *see Roscoe-Ajax Construction Co. v. United States*, 499 F.2d 639, 649-50 (Fed. Cir. 1974), and the CAFC's mandate did not order the Board to make revised findings and to decide such a theory.

SUFI based its count III lost revenues on x.4619 call data. SUFI's 13 February 2007 updated count III net lost revenues were $53,692,407.91, including $23,459,215.92 for 95 unknown DSN phone numbers listed in 89 lines and $30,233,191.99 for known DSN numbers. In that $53,692,407.91 are $176,778.72 for Spangdahlem building 38, number 542-5130 and $2,135,213.46 for unknown numbers in Rhein Main buildings 600, 632, 633 and 634, totaling $2,311,992.18. (Finding S8)

SUFI first corrects the foregoing $23,459,215.92 due to a $131,006.02 omission of Ramstein 303 lost revenues for unknown DSN phone numbers (app. remand br. at 84 n.18). In the $23,459,215.92 unknown numbers total lost revenues, SUFI failed to include the first 2 of the 89 lines of entries for Ramstein 303, whose amounts were $25,184.46 and 105,821.56, totaling $131,006.02. Thus, the adjusted 13 February 2007 lost revenues amount for unknown numbers is $23,590,221.94 ($23,459,215.92 + $25,184.46 + 105,821.56)[6] (app. remand br. at 84). SUFI next adjusted that $23,590,221.94 by $97,855.46 to $23,688,077.40 to correct the start date for Ramstein 303 from October 2000 to October 1999 (*id.* attach. L, tab 4A, page 1RR). Thus, the adjusted total lost revenues are $53,921,269.39 ($53,692,407.91 + 25,184.46 + 105,821.56 + $97,855.46).

SUFI multiplied $53,921,269.39 by 1.0468 to adjust the x.4619 phone usage from 10,135 min./mo. to 10,609 min./mo. (*SUFI VIII*, 09-1 BCA ¶ 34,018, finding 111), producing an adjusted net lost income amount of $56,444,784.80 (app. remand br., attach. L at 3). We adjust the $2,311,992.18 amount for the Spangdahlem and Rhein Main DSN phones by that 1.0468 factor, resulting in $2,420,193.42, and deduct from $56,444,784.80 that $2,420,193.42 and the $1,296,723.50 awarded in *SUFI IX, X, and XI*. Therefore, the additional net lost income amount is $52,727,867.88 ($56,444,784.80 − 2,420,193.42 − 1,296,723.50).

In *SUFI IX* on count III we awarded $2,758.43, including $773.96 for extra work and $1,984.47 claim preparation costs. 09-2 BCA ¶ 34,201 at 169,089, 169,094. Therefore, we add $275.84 for 10% profit on that $2,758.43. SUFI avers that the Board miscalculated that $2,758.43 by $12.09 (app. remand br. at 85, attach. F). Our review of SUFI's attachment F shows that we omitted .25 hours of Mr. Broyles' 27 September 2003, 3.75 hour entry (finding S10). The correct total amount is

---

[6] We have verified that the 89 lines of unknown numbers total $23,590,221.94.

$2,770.60, an increase of $12.17, which, with 10% profit, is $13.39. Thus, the total count III award for profit is $289.23 ($275.84 + 13.39).

In *SUFI XI* the Board rejected SUFI's assertion that "the *weighted* midpoint for damages is February 21, 2000" as "inconsistent with the unweighted midpoints we used in our prior decisions." 10-1 BCA ¶ 34,415 at 169,887. SUFI's 15 January 2010 motion for reconsideration in *SUFI XI*, stated: "The weighted midpoint is obtained by spreading the 'phone-months' for both the known and unknown numbers over the periods of usage, keeping a running total by month, dividing the grand total by 2, and seeing where the half-way usage point falls, which is February 21, 2000" (finding S11). The total number of hallway/lobby DSN phones per month at all guest lodgings from December 1996 through May 2005 was 7,400.5, one-half of which is 3,700.25. The number of such phones from December 1996 to 21 February 2000 is 3,714. (Gov't remand reply br. appx. I) These government data comport with SUFI's explanation of the weighted midpoint. Accordingly, the Board accepts SUFI's 21 February 2000 weighted midpoint for starting interest on count III damages.

## Count V, Other Operator Numbers Patching

The CAFC stated:

> We agree with SUFI that the Board's determination on Count V is not supported by substantial evidence. Even if SUFI did not carry its burden to prove that *all* of the calls in question were long-distance calls, there was no basis for the Board's conclusion that *none* of the calls could be counted towards SUFI's recovery.

The CAFC remanded count V "to the Board for reconsideration of whether SUFI's evidence provided a reasonably certain estimate — a fair and reasonable approximation — of damages from this breach." 755 F.3d at 1318.

## SUPPLEMENTAL FINDINGS OF FACT

S12. The government had call records for the 34 local numbers for indirect operator access that could have confirmed whether those calls were patched to the operator for long distance toll-skipping calls, but did not produce such records (tr. 18/138-40).

## DECISION ON COUNT V

In count V SUFI claimed breach damages: for *direct operator access*, the total minutes called from 5 numbers; for *indirect operator access*, calls from 34 local destination numbers that had 60 or more calls of 10 minutes or more; and for *AMC*, the difference between the usage during the months the auto-attendant feature was available and the average call usage before and after such period. *SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,251-52, findings 166-67.

The government argues that SUFI's damages are "wildly overstated" because it failed to sustain the burden of proof that all operator patched calls would have been made on the SUFI network (gov't remand br. at 55). The government had call records for the 34 local numbers for indirect operator access that could have confirmed whether those calls were patched to the operator for long distance toll-skipping calls, but did not produce such records (finding S12). We draw an adverse inference from such absence of government call records which overcomes the "evidentiary lacuna" that the patched calls were not made to local numbers, our rationale for denying all but $3,004.15 in damages to SUFI. *SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,254.

We hold that SUFI's evidence provided a reasonably certain estimate—a fair and reasonable approximation—of damages from this breach, and accept SUFI's criteria for measuring damages described above. We calculate damages for count V as follows:

| | |
|---|---|
| Lost revenues, Direct operator access | $ 333,471.84 |
| "      "      Indirect operator access | 1,193,304.05 |
| "      "      ACM terminal number | 46,451.17[7] |
| Subtotal: | 1,573,227.06 |
| Less: lost revenues awarded in *SUFI VIII* | 2,448.91 |
| Total lost revenues | $1,570,778.15 |
| | |
| Extra work damages: | |
| Ansola, 55.75 hours @ $37.26 | $2,077.25 |
| Broyles, 48.5 hours @ 21.15 | 1,025.78 |
| Smith, 71.5 hours @ $27.29 | 1,951.24 |
| Subtotal | 5,054.27 |
| Profit @ 10% | 505.43 |
| Subtotal: | 5,559.70 |
| Less: extra work damages awarded in SUFI IX | 2,892.20 |
| Total extra work damages | $2,667.50 |

---

[7] SUFI corrected the original figure of $46,910.42 to $46,451.17 to correspond to the monthly usage figures in ex. B-205, tab 6A at 326 (app. remand br. at 96-97).

11

These extra work hours derive from SUFI's count V claim, *SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,251, finding 165, applied to the Board's hourly rates (*id.* finding 11). We hold that the total additional recoverable damages on count V are $1,573,445.65 ($1,570,778.15 + $2,667.50).

## Count VI, Early DSN Abuse

The COFC awarded SUFI $122,942.50 damages for the early DSN abuse, including $75,000.00 for lost revenues, 108 Fed. Cl. at 316, 321. The CAFC reversed the COFC's ruling on SUFI's lost "profits" (sic, revenues) claim, vacated the COFC's ruling only with respect to compensation for extra work and out-of-pocket costs, and remanded the latter issue for determination by the Board. 755 F.3d at 1319.

The government argues that SUFI cannot recover its extra work and out-of-pocket expenses because it "elected" to analyze call records due to its unproven suspicion of toll skipping abuse, SUFI's claimed hours were not "actual" but an "estimate" and were "an excessive amount of time for an unproductive analysis" (gov't remand br. at 77-79).

The government's arguments are unsound, because notwithstanding SUFI's failure to prove lost revenues *damages*, it did prove that lodging guests circumvented the SUFI telephone network to patch outgoing long distance calls. *See SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,233-34. Thus, SUFI is entitled to compensation for its extra work and out-of-pocket expenses in investigating such guest circumventions. SUFI calculates those extra work and out-of-pocket costs to reflect the Board's determination of the SUFI employee hourly rates, with profit, as follows:

| | |
|---|---|
| Stephens, 172 hrs. @ $66.83 | $11,499.92 |
| Holzapfel, 340 hrs. @ $33.65 | 11,441.00 |
| Ansola, 1.25 hrs. @ $37.26 | 46.58 |
| Subtotal | $22,987.50 |
| Profit @ 10% | $ 2,298.75 |
| Subtotal | $25,286.25 |
| Out-of-pocket expenses | $ 1,400.00 |
| Profit @ 10% | 140.00 |
| Total | $26,826.25 |

(App. remand br. at 106-07) We hold that SUFI is entitled to recover $26,826.25 on count VI.

12

## Count VII, Delta Squad

The COFC affirmed the Board's award of breach damages of $184,314.54 for lost revenue, extra work and out-of-pocket costs resulting from two government DSN phones prior to 13 April 2000, reversed our denial of lost revenue damages for phones x.6998 and x.6999 SUFI installed on 13 April 2000, and awarded SUFI $1,349,877.86 ($1,534,192.40, less the $184,314.54 Board award). 108 Fed. Cl. at 309, 320-21.

The CAFC vacated the COFC's ruling on the x.6998 and x.6999 phones SUFI installed and remanded to the Board for further findings with respect to—

> The circumstances under which SUFI replaced the last two government DSN phones with its own phones….the evidence regarding the government's alleged initial refusal to remove the phones or eventual agreement to removal only if SUFI replaced them with its own phones….
>
> …If SUFI installed and maintained those phones only under threats that breached the contract, the Board's rationale for denying recovery for losses caused by the presence of the SUFI-installed phones cannot stand.

755 F.3d at 1319-20.

## SUPPLEMENTAL FINDINGS OF FACT

S13. The 8 June 1999 email of Ms. Ansola, SUFI's manager in Germany, to SUFI's manager, Mr. Myers, stated:

> We have a major confrontation coming up about DSN phones at Sembach….
>
> Just found out that a couple of commanders have given orders to the Comms Squadron to install 8 DSN telephones with "free" access to the States…. These phones are going into…one room each in two different lodging facility buildings. They also want extra DSN phones with worldwide access put into rooms "without" our knowledge for some of the officers. This situation is happening only at Sembach and I need to put it to a stop.

(R4, tab 84B at 2674)

13

S14. Ms. Ansola's 3 February 2000 email to USAFE's Mr. Branham stated:

> Last week I met with MSgt. Washington and we discussed the phone line for Delta [Squad] to call directly into the rooms....
>
> ...At first I looked the other way about the DSN phones in Delta Squadron's room being used for "morale calls". The contract clearly states that DSN is to be at a local level and no DSN phones outside of the rooms are to remain at the lodging facility except for administrative use.... It was agreed that we would leave the lobby phone unblocked so those TDY could make morale calls.
>
> ....
>
> We are averaging 15% of the rooms in building 210 and 212 making calls. In the other buildings at Sembach we are averaging more than twice this amount. Sgt Washington told me that they are not monitoring the DSN phones. These numbers seem to indicate that the guests are doing more than making their weekly morale calls.

(R4, tab 84B at 2675-76)

S15. Under SUFI's "Germany Trip Report 2/27/00 – 3/10/00" is the following:

> There remains an ongoing issue with "Delta Squad" who [sic] is now occupying 2 buildings. Delta Squadron...remain[s] at Sembach for three months and then a new crew comes back in. These 2 buildings are doing half the amount of revenue as the other buildings. Our intention is to take out the govt. DSN phones, which are located in the Delta Squad lounge area, and replace them with our own DSN phones that will tie into our system. By doing this we will be able to monitor the DSN calls to see if they are abusing it. It is believed that the commander of Delta Squadron has told the front desk "not" to activate the PINS for his crew because the phone calls were to [sic] high. This commander is no longer at Sembach but will rotate back in a few months. Cecilia has

14

scheduled a meeting with the new commanders of Delta
Squad to try and resol[v]e this issue.

(ASBCA 54503, ex. A54 at 178-79)

S16. In April 2000 SUFI received the Air Force's conditional approval to replace the two government DSN phones with two SUFI phones. Ms. Ansola testified: "[I]f we didn't put our own phones in, they would not remove the [government phones].... I knew that I could then monitor the phones and be able to show what kind of abuse was happening on those two [government] phones." She discussed SUFI's reasoning with the COTR. (Tr. 4/178-79) Ms. Ansola's chronology stated:

> 2000
> February met with a Master Sergeant for Delta Squad.
> There is no monitoring systems in place and the flight
> crews can make unlimited calls to the States. There were
> two DSN phones for the flight crews and last year we had
> them removed and agreed to put two SUFI phones with the
> same level of service. After monitoring we discovered that
> many calls exceeded the allowable 15 minutes [for morale
> calls] and several calls were as long as 2 hours. Asked if
> they would at least have a sign in/out sheet with names and
> time on phone. Had several meetings, but nothing has
> changed and no monitoring is in place.

(R4, tab 84B at 2684)

S17. On 11 April 2000 SUFI installed two SUFI phones in Delta Squad, Sembach Bldg. 210 (tr. 6/193, 195-97). On 12-13 April 2000 SUFI programmed those phones for local DSN connection to morale call number 480-4663 (ex. B205, tab 8B at 361; tr. 12/32-33, 109, 112).

S18. COTR Adams' 17 January 2001 email to USAFE's Messrs. Branham and White stated:

> On 11 Jan 01, SUFI brought forth concerns to the
> [CO] regarding DSN usage in...the Delta Squadron. [The
> contractor] explained that often...a new commander...will
> order additional phones to be installed in the administrative
> area used by the unit. The contractor alleges that these
> phones are being used...to make morale calls.

15

> The contractor's interpretation of the contract is clear.... Military personnel supporting a unit who need to stay in the lodging facilities with their units, may have DSN access for administration work only. Use of these phones for morale purposes is prohibited.... SUFI Networks will provide one lobby telephone per lodging facility with DSN access for morale calls. Morale calls are defined as one call per week not to exceed 15 minutes in duration.

(R4, tab 84B at 2663-64)

S19. Ms. Ansola's 31 May 2001 email to AFNAFPO contract specialist Charlotte Guilmenot stated:

> We also replaced two DSN phones with our phones for Delta Squadron at Sembach (special flight crews) assigned there on a 90 day rotation. These phones, calling DSN, were to be used for morale calls limited to one 15 minute call per week. We have been able to monitor length of calls and found abuse. (30 minute to 2 hour calls) I have talked with the head operator and she does not have any orders to ask for control numbers. Therefore, she will put all calls through to the States made on a DSN phones [sic] without asking for control numbers or monitoring length of call....
>
> ...I've asked, and been ignored, to have Delta people at least make the callers sign in and out when making "morale calls".

(R4, tab 84B at 2682)

S20. Ms. Ansola's 11 August 2001 email to Mr. Myers stated: "When I have threaten [sic] to remove the morale phones from Sembach if they did not control and monitor better, I was told by a commander that he would order his people to not use our phones. Another commander I spoke with agreed and for his 90 days we had no abuse." (R4, tab 84B at 2686)

S21. Ms. Ansola's 12 June 2003 memo to USAFE's David White stated:

> Attached are copies of hours going over the two "morale" phones that we installed at Sembach. Over the past few

16

years we have sent letters, discussed with your office and Sam [Adams'] office, and even talked with Commanders to try and get some kind of control over the calls on the two phones....

....

There is no place in our contract that says we have to have morale phones. Therefore, we are giving 10 days notice and will remove the phones. Please let Delta know that they are not allowed to have the Communication Squadron install DSN phones to replace our telephones.

(R4, tab 84B at 2692)

S22. Mr. Myers' 8 August 2003 email to AFNAFPO CO Cedric Henson summarized the Delta Squad issues:

C. "Morale Phones" at Sembach

Since cut over at Sembach mid-1998, we have had a very big issue with "morale phones" at that location.... In 2000 we finally got them to agree not to install more DSN phones. They removed the ones they did have, and they were replaced by two of our phones so we could keep track of the calls and get an accurate estimate of the problem. We've asked several times that someone monitor the call length or have a sign in/sign out sheet.... The Delta guys immediately started calling over 500 and 700 hours per month on these two morale phones. Cecilia Ansola went to the Commanders, hotel managers, Comms, COTR, and the contracting office asking for assistance to stop the DSN abuse....

When we said we would remove the phones if the abuse was not controlled, we were told that it was "not a good idea as it is a touchy situation with the Delta Squadron." The Commander at the time told Cecilia Ansola that if she took out the phones they would boycott the phone system. Basically he would "order" his guys to not use the phones. Phones are still being

17

abused today in the Sembach lounge, and need to be removed.

(R4, tab 84B at 2668-70)

S23. Ms. Ansola talked about morale call abuse with several Delta Squad commanders, but "I had no success with talking with them" (tr. 4/183). Ms. Ansola stated that COTR "didn't want me to remove them. She wanted to make sure that we had something confirmed because the Delta Squad.... I just know that everybody wanted to keep them happy...nobody seemed to want to make an effort to have the phones removed from Delta Squad." (Tr. 4/181-82)

S24. We find that none of the foregoing evidence supporting SFs 13-23 was opposed by any government evidence.

## DECISION ON COUNT VII

In *SUFI VIII* we held that contract "§ E.2 required respondent to remove government-installed DSN phones in Building No. 210's Day Room outside of the 'administrative area' and its failure to remove them on cutover in May 1999 was a breach of contract." 09-1 BCA ¶ 34,018 at 168,262.

In light of our supplemental findings on count VII, we conclude that SUFI: (1) did not volunteer to install phones x.6998 and x.6999 in the Day Room as a favor to the government, but rather to induce it to remove the last two government DSN phones from the Day Room and to enable SUFI to monitor Delta Squad calls for proof of their abuse (findings S16-S19), and (2) maintained phones x.6998 and x.6999 after 13 April 2001 under protest because a Delta Squad commander told Ms. Ansola that if SUFI removed phones x.6998 and x.6999, he would order his people not to use SUFI's room phones (findings S20, S22, S23), which would breach the contract, and the Air Force thereafter tacitly forbade the removal of those phones. We hold that our *SUFI VIII* rationale "that respondent had no duty to remove phones x.6998 and x.6999 from the Day Room" was not supported by the preponderance of record evidence, and hence our denial of recovery for SUFI's losses caused by the presence of those phones cannot stand. 09-1 BCA ¶ 34,018 at 168,262.

SUFI seeks $1,335,438.00 in additional damages for count VII, comprised of $1,326,845.30 in lost revenues on phones x.6998 and x.6999 and $8,592.70 in extra work and claim preparation costs with 10% profit, net of $1,566.44 awarded in *SUFI IX* (app. remand br. at 124-26).

18

The Air Force argues that it had no duty to remove SUFI-owned and installed phones because it was free to remove its phones at any time, a "contemporaneous retort from one of many rotating Delta Squadron commanders…does not amount to a breach of contract" and its damages are excessive, *inter alia*, due to flawed calculation of damages on government DSN phones prior to April 2000 (gov't remand br. at 81-86). We reject these government arguments as unsupported by our original findings in *SUFI VIII* and *SUFI IX*, as well as our foregoing supplemental findings on count VII.

We hold that SUFI is entitled to recover an additional $1,335,438.00 on count VII.

## Count VIII, Prime Knight Lodgings

The CAFC's count VIII decision stated: "[W]e reverse the [COFC] on Count VIII," 755 F.3d at 1321, but did not expressly remand that count to this Board. However, as analyzed in Count I above, the CAFC remanded for the Board to add 10% profit "for all work and out-of-pocket expenses," *id*. at 1324, including count VIII. The government's remand briefs do not comment on count VIII.

SUFI seeks 10% profit on $7,400.75 in extra work and out-of-pocket expenses awarded by the Board on count VIII (app. remand br. at 129). The $7,400.75 accurately sums the $7,017.15 + 37.26 + 21.15 + 300.19 amount allowed for extra work, plus $25.00 for out-of-pocket expenses. *SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,244, 168,290; *SUFI IX*, 09-2 BCA ¶ 34,201 at 169,095. Ten percent of $7,400.75 is $740.08, which amount we award to SUFI. SUFI also seeks to recover $8,086.43 including profit for 110 hours of Mr. Stephens' extra work not awarded by the Board in *SUFI VIII*, but awarded by the COFC, on the allegation that the government did not contest the COFC's extra work award. However, the CAFC reversed the COFC's entire count VIII decision, and did not remand to the Board any issue of additional extra work costs other than to add 10% profit. We interpret the CAFC's phrase, "for all work and out-of-pocket expenses" to mean all such expenses previously awarded by the Board for count VIII. Therefore, we deny SUFI's request for the additional $8,086.43 not so awarded.

## Count XI, German Troops Housing

The COFC held that the Board's failure to award damages for SUFI's lost revenues claim based on housing non-transient German troops at Sembach Building 212 "was clear error." 108 Fed. Cl. at 317. On appeal, the CAFC stated:

> The Board did not…explain why it was not awarding
> damages for SUFI's lost profits on the phones in rooms
> occupied by the German troops. In these circumstances,

19

we cannot uphold the Board's decision under the Wunderlich Act standard of review. But the [COFC] erred in itself determining the proper damages for Count XI. We vacate the [COFC's] ruling on Count XI and order that count remanded to the Board for further consideration.

755 F.3d at 1321 (citation omitted).

The government argues that if "German troops had not been lodged in Building No. 212, then SUFI's average revenue during the July 03—May 05 period would have been accordingly higher and SUFI's recovery on Count IV accordingly lower. Further compensation for these 23 months [under count XI] would be double counting." (Gov't remand br. at 88)

SUFI argues that the government failed to present the foregoing argument to the Board before 2010 or to the COFC or to the CAFC on appeals, so it is untimely and has been waived (app. remand reply br. at 45).

The government's argument conflicts with the facts found. SUFI's count IV, A&B Bed Switch, Use of Pins and LTS Switch, claimed breaches from March 2003 to May 2005 at Spangdahlem, Rhein Main, Ramstein, Vogelweh, and Landstuhl lodgings. *SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,266, finding 230. SUFI's count XI, German Troops Housing, claimed a breach from March 2003 through May 2005 at Sembach Building 212. *Id.* at 168,268, finding 243. Therefore, the record does not show any duplication of lost revenues.

On further consideration, we hold that SUFI is entitled to recover $50,078.64, composed of $49,909.02 (ex. B205, tab 12A at 385) for lost revenues and $169.62 as 10% profit on $1,042.88 in extra work costs and $653.32 in claim preparation costs awarded in *SUFI IX*, 09-2 BCA ¶ 34,201 at 169,095.

### Count XVI, Lost Profits

The CAFC panel stated: "[W]e see no error in denying recovery for the two facilities built at SUFI-served bases after the contract termination" and affirmed the COFC's "conclusion that SUFI's post-termination lost profits should be calculated for a term of fifteen years from the date of completion and acceptance of the telephone system at each site," on which basis the Board is to "recalculate damages under Count XVI." 755 F.3d at 1322-23.

Thus, our count XVI recalculations are to include (i) lost revenues found by the Board in counts not challenged in Wunderlich Act review, (ii) lost revenues for counts

20

affirmed by the Federal Circuit, and (iii) the lost revenue calculations for the counts in this remand decision.

SUFI argues that the Board should recalculate lost profits in the amount of $67,497,173.37, less the $2,646,116 the Board previously awarded for count XVI (app. remand Proposed Findings of Fact at 92). The Air Force argues that "completion and acceptance" of each phone system occurred at cut-over, SUFI should not receive a windfall of added years of lost profits by its alleged "breach" by failure to complete LFTS testing before cut-over, and its profit rates were unsustainable for 15 years into to future (gov't remand br. at 91, 94, 97-101).

The Air Force's arguments are not well taken. We are not free to disregard the CAFC panel's unambiguous holding that the 15-year term commenced "from the date of completion and acceptance" of the LFTS. The Air Force points to no evidence to substantiate its SUFI breach assertion. The CAFC did not order the Board to make fact-finding with respect to the contract cut-over, test and acceptance procedures or profit sustainability.

The Board identified the methodology for calculating count XVI lost profits, which we applied in *SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,281-86, *SUFI IX*, 09-2 BCA ¶ 34,201 at 169,092-93, *SUFI X*, 10-1 BCA ¶ 34,327 at 169,535, and *SUFI XI*, 10-1 BCA ¶ 34,415 at 169,887. We use that methodology in this remand decision, adding the adjustments required by the CAFC's directions.

(A) The Board accepts SUFI's claim calculation of $4,086,619.39 total actual revenues it received from January 2002 through May 2005, including Ramstein (R), $3,269,820.99; Spangdahlem (S), $434,979.71; and Rhein Main (RM), $381,818.69 (*SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,281-82, finding 318; app. remand Proposed Findings of Fact, attach. D, tab 17A at 1).[8]

(B) The Board adjusts SUFI's calculation of gross lost revenues due to government breaches from January 2002 through May 2005 to reflect the Board's damage decisions and those of the COFC affirmed by the CAFC, as follows:

---

[8] Under SUFI's revenue accounting system, the "Ramstein" revenue also included the Landstuhl, Vogelweh, Kapaun and Sembach revenues. The "Spangdahlem" revenue also included the Bitburg revenues (*id.*).

| Count | Description | Allocation | Gross Lost Rev. |
|---|---|---|---|
| I | Calling Cards | R | $ 147,138 |
| | | S | 20,750 |
| | | RM | 20,750 |
| II | Front Desk Patching | R | 225,374 |
| III | Hallway/Lobby DSN Phones | R | 19,263,415 |
| | | RM | 407,484 |
| IV | A&B Bed/PINs/LTS | R | 414,046 |
| V | Other Operator Nos. | R | 1,029,779 |
| VII | Delta Squad | R | 1,001,125 |
| IX | Sembach Line Charge | R | 427,378 |
| XI | German Troops Housing | R | 49,909 |
| XII | Missing Rooms | R | 73,824 |
| | | RM | 146,203 |
| XIII | Temporary Shutdowns | R | 133,709 |
| | TOTAL | | $23,369,884 |

Including Ramstein: $22,765,697; Spangdahlem: $20,750; and Rhein Main: $574,437.

(C) We add the foregoing actual and Board-adjusted gross lost revenues, rounded to the nearest dollar:

| Location | Actual Rev. | Lost Gross Rev. | Total Revs. |
|---|---|---|---|
| R | 3,269,821 | 22,765,697 | 26,035,518 |
| S | 434,980 | 20,750 | 455,730 |
| RM | 381,819 | 574,437 | 956,256 |

(D) We divide the foregoing total revenues by the duration in years of post-2001 performance to obtain the average annual lost revenues:

R $26,035,518 ÷ 3.417 = 7,619,408
S  455,730 ÷ 3.417 = 133,371
RM  956,256 ÷ 2.915 = 328,047
    Total: $8,080,826

(E) We multiply the foregoing average annual gross lost revenues by the respective number of unperformed years after base LFTS acceptance of each location to derive total gross lost profits. The respective dates for those locations are 15 years

after LFTS acceptance for Ramstein and Spangdahlem, and 30 June 2005 for Rhein Main (app. proposed findings of fact, attach. D, tab 17A, n.6):

| | | |
|---|---|---|
| R | $7,619,408 x 10.014 = | $76,300,752 |
| S | $133,371 x 10.285 = | 1,371,721 |
| RM | $328,047 x 0.083 = | 27,228 |
| | Total: | $77,699,701 |

(F) We have verified the accuracy of SUFI's room adjustment factors and proportion them to our average annual gross lost profits (step (D)) (*see* app. proposed findings of fact, attach. D, tab 17B, notes 1 and 2), as follows:

| Year(s) | Annual Revenue | Room Adj. | Gross Lost Profit |
|---|---|---|---|
| 2005 (7 mos.) | $4,539,851 | 0.9996 | 4,538,035 |
| 2006-2014 (9 yrs.) | | | |
| $7,752,779 x 9 = | 69,775,011 | 1.0028 | 69,970,381 |
| 2015 (@ 6 mos.) | 3,349,708 | 1.0028 | 3,359,087 |
| | | Total: | 77,867,503 |

(G) We calculate the Air Force's revenue share from the gross lost profits (step (F)), less SUFI's local revenue adjustment factor of 0.1345, as follows:

| Year | Gross Lost Rev. | Local Rev. | Long Dist. Rev. | Rev. Share |
|---|---|---|---|---|
| 2005 | 4,538,035 | 76,239 | 4,461,796 | 104,852 |
| 2006 | 7,752,779 | 130,247 | 7,622,532 | 205,046 |
| 2007 | 7,752,779 | 130,247 | 7,622,532 | 221,053 |
| 2008 | 7,752,779 | 130,247 | 7,622,532 | 276,698 |
| 2009 | 7,752,779 | 130,247 | 7,622,532 | 331,580 |
| 2010 | 7,752,779 | 130,247 | 7,622,532 | 384,176 |
| 2011 | 7,752,779 | 130,247 | 7,622,532 | 436,771 |
| 2012 | 7,752,779 | 130,247 | 7,622,532 | 461,163 |
| 2013 | 7,752,779 | 130,247 | 7,622,532 | 484,793 |
| 2014 | 7,752,779 | 130,247 | 7,622,532 | 509,185 |
| 2015 | 3,349,708 | 59,625 | 3,290,083 | 221,094 |
| Totals: | 77,664,280 | | | 3,636,411 |

(H) We accept SUFI's projected expenses for each of the 11 years of lost long distance call revenues, which total $15,814,524 in expenses (app. proposed findings of fact, attach. D, tabs 17D, 17E).

23

(I)     We recalculate SUFI's net lost profits as follows:

| | |
|---|---|
| Adjusted Gross lost Profits: | $77,867,503 |
| Less: Revenue Sharing | ( 3,636,411) |
| Less: Projected Expenses | (15,814,524) |
| Total Net Lost Profits: | $58,416,568 |
| Less: Lost profits previously awarded | ( 2,646,116) |
| Additional net lost profits | $55,770,452 |

## Count XVIII, SIMS/LTS Interfaces; Count XXII, Change of Air Force Switches

The COFC held that the government was liable and increased the Board's award ($154,781.27) to $480,626.85 on count XVIII, and reversed the Board's denial of recovery on count XXII and granted SUFI's claim in full. 108 Fed. Cl. at 312, 315. The CAFC panel ruled: "We vacate the [COFC's] ruling in this respect [namely, calculating damages directly] and order remand for the Board to determine damages for Counts XVIII and XXII, consistent with the [COFC's] liability determinations. 755 F.3d at 1323.

On both counts XVIII and XXII, the parties agree within one penny of the amount to be awarded to SUFI, as adjusted for Ms. Ansola's hourly rate and deducting the amounts previously awarded by the Board: for count XVIII, $209,351.16 and for count XXII $153,238.58 (app. remand br. at 141, 143; gov't remand br. at 107, 109; app. remand reply br. at 58, 59).

We hold that SUFI is entitled to $209,351.16 for count XVIII and $153,238.58 for count XXII.

## Interest

SUFI is entitled to interest on each of the foregoing claim count amounts from the date specified in SUFI's claim for each count at the Federal Reserve Board (FRB) monthly prime rate, as held in *SUFI VIII*, 09-1 BCA ¶ 34,018 at 168,224-25 (since the PSA (Partial Settlement Agreement) did not specify the interest rate, SUFI calculated, and respondent did not object to use of, the FRB prime interest rate) including the 21 February 2000 weighted midpoint for starting interest on count III damages, until payment.

24

## CONCLUSION

We tabulate by count the following additional amounts awarded to SUFI in this remand decision (which do not include the $2,790.930.17 awarded by the Board in the 16 counts not appealed to the COFC):

| Count | Added Amount |
|-------|-------------|
| I | $ 2,106.36 |
| III | 52,728,157.11 |
| V | 1,573,445.65 |
| VI | 26,826.25 |
| VII | 1,335,438.00 |
| VIII | 740.08 |
| XI | 50,078.64 |
| XVI | 55,770,452.00 |
| XVIII | 209,351.16 |
| XXII | 153,238,58 |
| Total: | $111,849,833.83 |

We sustain this appeal to the extent set forth above, plus interest on such principal amount in accordance with this opinion.

Dated: 2 February 2015

DAVID W. JAMES, JR.
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MONROE E. FREEMAN, JR.
Administrative Judge
Acting Vice Chairman
Armed Services Board
of Contract Appeals

25

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 55306, Appeal of SUFI Network Services, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
